People v Santiago (2004 NY Slip Op 50015(U))

[*1]

People v Santiago

2004 NY Slip Op 50015(U)

Decided on January 21, 2004

Supreme Court, New York County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 21, 2004

Supreme Court, New York County
 THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, —
against
EDWIN SANTIAGO, Defendant.
Ind. No. 0551/03

Irwin Shaw, The Legal Aid Society, Criminal Defense Division, New York County (Seth Gross, of counsel), for defendant. Robert M. Morgenthau, District Attorney, New York County (Nichole Parisi and Patricia Barley, of counsel), for plaintiff.

Edward J. McLaughlin, J.
The defendant has been ordered to appear in a line-up so that two recently discovered witnesses can view him before trial. The defendant previously was identified by the victim as the person who spoke with her and then slashed her face. She selected the defendant in a traditional simultaneous line-up.
Defendant moves the court to direct the People to conduct the upcoming line-up for the two witnesses in the sequential and double-blind fashion. The People oppose. In their respective papers, each side cites various trial court decisions supporting its position and each recounts and seeks to synopsize social science research regarding identification by a person of a stranger, and the application of this research to the criminal justice system. Defendant also requests that the court order law enforcement officials to conduct the line-up in accordance with instructions contained in a twelve-page attachment to the motion. The defense motions are denied.
The court denies the motion for two reasons. First, the court concludes that courts do not have the authority to direct law enforcement about how to conduct a line-up. Simultaneous line-ups are constitutional. Law enforcement officers investigate crime. The courts review law enforcement's methods for constitutionality to determine if an identification that has been made was suggestive unconstitutionally. Second, the court concludes that the line-up procedures requested by the defense raise multiple questions that, so far, have not been answered to the court's satisfaction.
The Supreme Court has held that the judiciary's function regarding the reliability, i.e., correctness, of line-up identification is to determine whether a procedure or process was impermissibly suggestive and whether the practice as applied, created a substantial likelihood of irreparable misidentification (see Manson v Brathwaite, 432 US 98, 114 [1977]). This review occurs after a witness has identified a person in a line-up. The defense here seeks court intervention prior to the line-up and prior to witness's effort to identify the assailant. The court [*2]declines to do so, agreeing with the three trial courts that have held that courts lack the authority to order how line-ups should occur (see People v Aspinall, 194 Misc2d 630, 631-632 [Sup Ct, Richmond Co 2003]; People v Martinez, ___Misc2d___, 2001 WL 1789315 [Sup Ct, NY Co 2001]; People v Franco, ___Misc2d___, NYLJ, July 5, 2001, p. 20, cols 5-6 [Sup Ct, Bronx Co]).
A quarter century ago, one request for court intervention regarding the physical condition of fillers was denied. The decision articulates the rationale for a court's refusing to manage a line-up or require specific procedures. In denying a defense request to require fillers who limped the court said:

"In exercising whatever discretion it has the Court removes itself from its proper function and becomes enmeshed in the prosecution's fact gathering process and the defendant's trial tactics. Such does not appear to me to comport with the Court's proper role. Undoubtedly, the Court has a significant role to play after the lineup. It must insure that 'tainted evidence' is not introduced into evidence. Such a role is very different than, in effect, actively supervising the lineup. The latter role is closer to the Court rendering an advisory opinion ... as to what procedure will pass constitutional muster. * * *
In the final analysis, the lineup is a law enforcement tool. Law enforcement has the right to run the lineup as they choose, subject, of course, to the requirement that if in their zeal they breach canons of due process by an unduly suggestive lineup, their efforts will avail them nought" (United States v. Crough, 478 Fsupp 867, 868-870 [US Dist Ct, ED Cal 1979]).
In reaching the opposite conclusion, some courts have analogized the situation to a court's sanctioning the taking of body evidence and the court's ability to direct how blood can be acquired from a person within the criminal justice system (see People v Wilson, 191 Misc2d 224, 226 [Sup Ct., Kings Co. 2002]; Matter of Rahim Thomas, 189 Misc2d 487, 491 [Sup Ct, Kings Co. 2001]). This court does not consider that analysis helpful or persuasive. The sanctity accorded to one's body and the protection of it from government intrusion is well settled. That right has no parallel here where one non-intrusive constitutional evidence gathering tool is sought to be required in place of another constitutionally approved method.
Indeed, courts have not mandated procedural variations to accepted constitutional practices even where there is nearly universal acknowledgment that the proposed modification would be fairer than the customary practice. For example, in a homicide case with no eyewitnesses, in New York, the police are not required to video or audio tape an interview with a suspect. This is true even when the potential significance of the suspect's statement is obvious to law enforcement before the questioning and a prosecution depends on obtaining an incriminating statement from the suspect. Also, during line-ups, as well, courts have not interfered to require [*3]that law enforcement officials conducting the line-up must say to the viewing witness either that the criminal may not be in the line-up or that, regardless of the outcome of the line-up, the investigation will continue. That such statements are fairer seems clear. Yet, they are not mandated despite their apparent ability to enhance a line-up's fairness. (But query—whether a statement to the witness that he person may not be in the line-up" can cause unwarranted doubt similar to unwarranted confidence if the witness were told "we have someone for you to see" if the person is not going to view two separate line-ups, one with the suspect and one without the suspect).
But even if courts have the authority to direct how line-ups should be conducted, this court is reluctant to exercise that authority in the absence of any appellate guidance about what standards, if any, govern the exercise of that authority. The case law in this area seems to contain no room for an individualized, case-by-case analysis, such as exists with applications for expert testimony about eyewitness identification. Indeed, the Court of Appeals requires that courts engage in a case-by-case analysis when the defense requests such an expert to testify at trial (see People v Lee, 96 NY2d 157 [2001]). Yet, the defense application here is devoid of facts about this case. Rather, it is based exclusively on the scientific studies that presently exist and which, at least partly, contradict each other. Because there is no criteria for ordering sequential and or double blind line-ups, if the court orders one here, can it decline to order such line-ups in the future and on what basis?
The defense application raises the additional problem of what a court can and should do if law enforcement violates an order for a sequential, double-blind line-up. Does a court have the ability to enforce a contempt citation if the police or the District Attorney fail to conduct a sequential line-up? Is an order for a sequential line-up within a court's purview? If a sequential line-up order were violated, is that a basis to suppress any identification that occurs in a simultaneous line-up held in defiance of a court directive to hold a sequential one? If a witness in a sequential line-up wishes to see a person whom it has already viewed, are the police allowed to grant the wish? If they permit a witness a second view, have they converted the line-up into a simultaneous one or into a new entity—a quasi-simultaneous one? If a witness views a person twice and selects the person is it suppressible or contemptible? If such an identification cannot be suppressed for violating a court order, is an order for a sequential line-up anything more than an advisory opinion? Until these questions are answered by an appellate court, this court is reluctant to begin directing law enforcement about how to conduct line-ups.
In light of the current the social science research on the topic of eyewitness identification and the lack of appellate guidance about when, if ever, a court may direct how law enforcement conducts line-ups, this court will not order the two non-victim witnesses to view a sequential line-up where the complainant-victim already has viewed a simultaneous one. To do so would interject the court in trial strategies of one or both sides. Nor can the court grant the defense request, made in good faith, for its representatives to be present in the area where a witness views the line-up. Witnesses often are uncomfortable in these settings for a host of reasons. They should not have more information to process or more to worry about by virtue of additional people, however they are identified, being present during the line-up.
Until an appellate court definitively speaks on the issues presented by the defense motion, any decision about reforming present line-up practices must rest with the elected District [*4]Attorneys and others within the Executive Branch. They can add questions to those asked to the witness before and during the viewing. They can make line-ups fairer. See G. Wells, You Asked About the Sequential Lineup: Can You Read This First?, faculty/gwells/youaskedaboutsequential.htm> (December 2001). They know the practical aspects of obtaining fillers in their locals. They are aware of budgetary and staff resources for payment of appropriate fillers or make-up for them. They are aware of what situations would permit a defense representative to be with a viewing witness and when a reluctant or fearful witness needs an assurance of anonymity for as long as possible. Only an elected District Attorney is aware of the staffing of the various police agencies in his or her county. Only they can decide when to adopt the double-blind method and whether given the number of witnesses, the nature of the case and the size and geographical dimensions of the county in question, the police can conduct a double-blind line-up.
The court is aware of misidentifications that have been published long after the fact. It is troubled more so by the misidentifications that never will come to light. Moreover, the various methods offered in an effort for reducing incorrect witness identifications including but not limited to simultaneous v sequential line-ups, such as further instructions to the viewing witness or the potential significance of their absence, are not adaptable to jury trials or even Wade hearings. Proving the effect of what did not occur is never easy. It sounds trite but there are no simple solutions to problem identifications.
While the court does not advocate it, the only way to assure now that a fact-finder as to guilt or non-guilt in an identification case, is familiar with all of the factors contained in literature, research and case law that might contribute to an identification or to a misidentification is for a trial before a judge only. In such a trial, all that occurred and did not occur can be advanced for consideration. Such is not possible in a jury trial.
Dated:New York, New York
January 21, 2004
J.
Decision Date: January 21, 2004