[850 NE2d 623, 817 NYS2d 576]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RUDOLPH YOUNG, Appellant.

Argued March 30, 2006; decided May 9, 2006

## POINTS OF COUNSEL

*Muldoon & Getz,* Rochester (*Gary Muldoon* of counsel), for appellant. I. The trial court erred as a matter of law in finding that the witness had an independent source for her identification testimony. (*People v Underwood,* 239 AD2d 366; *People v Malloy,* 55 NY2d 296; *People v Dickerson,* 50 NY2d 937; *People v Garcia,* 255 AD2d 522; *United States v Wade,* 388 US 218; *People v Pries,* 206 AD2d 873; *People v Moore,* 96 AD2d 1044; *People v Boyce,* 89 AD2d 623; *People v Reyes,* 151 AD2d 435; *People v Hall,* 81 AD2d 644.) II. It was an abuse of discretion as a matter of law for the trial court to deny the defense request to call an expert witness as to identification. (*People v Lee,* 96 NY2d 157; *People v Mooney,* 76 NY2d 827; *People v Jones,* 210 AD2d 904; *People v Carroll,* 300 AD2d 911; *People v Taylor,* 75 NY2d 277; *People v Henson,* 33 NY2d 63; *People v Cronin,* 60 NY2d 430; *People v Aphaylath,* 68 NY2d 945; *People v Lewis,* 137 Misc 2d 84; *People v Brooks,* 128 Misc 2d 608.) III. The trial court erred in adjudicating defendant a persistent felony offender. (*People v Rivera,* 5 NY3d 61; *People v Rosen,* 96 NY2d 329; *Brown v Greiner,* 258 F Supp 2d 68, 409 F3d 523.)

*Michael C. Green, District Attorney,* Rochester (*Kelly Christine Wolford* of counsel), for respondent. I. The trial court properly found that Lisa Sykes had a basis independent of a suppressed identification procedure from which she could identify defendant. (*People v Dodt,* 61 NY2d 408; *United States v Wade,* 388 US 218; *People v Underwood,* 239 AD2d 366; *People v Moore,* 96 AD2d 1044; *People v Pries,* 206 AD2d 873; *People v Hall,* 81 AD2d 644; *People v Garcia,* 255 AD2d 522; *People v Reyes,* 151 AD2d 435; *People v Boyce,* 89 AD2d 623; *People v Malloy,* 55

NY2d 296.) II. The trial court properly exercised its discretion in denying defendant's request to present expert testimony on the issue of eyewitness identification. (*People v Lee*, 96 NY2d 157; *People v Cronin*, 60 NY2d 430; *People v Taylor*, 75 NY2d 277; *People v Wesley*, 83 NY2d 417; *United States v Rincon*, 28 F3d 921; *People v Miller*, 8 AD3d 176; *People v Perry*, 251 AD2d 895; *People v Knighton*, 165 AD2d 904; *United States v Mathis*, 264 F3d 321; *United States v Kime*, 99 F3d 870.) III. Defendant was properly sentenced as a persistent felony offender. (*People v Rivera*, 5 NY3d 61; *People v Rosen*, 96 NY2d 329; *Brown v Greiner*, 259 F Supp 2d 68, 409 F3d 523.)

## OPINION OF THE COURT

R.S. SMITH, J.

The main issue is whether the trial court abused its discretion when it refused to allow an expert to testify about factors that affect the reliability of eyewitness identifications. The question is close, and the testimony might well have been admitted, but we conclude that there was no abuse of discretion.

### Facts and Procedural History

In 1991, an intruder, concealing most of his body under a blanket and wearing a scarf over the lower part of his face, entered the home of William and Lisa Sykes and demanded money. He held an axe over the head of Mr. Sykes, who was in a wheelchair, and threatened to kill him. The Sykeses, accompanied by the intruder, looked for and found their wallets and turned over their cash. The intruder also took several watches from the top of their dresser. The Sykeses later found that other property, including binoculars and a pair of gloves, was missing from their cars.

Mrs. Sykes estimated that the intruder was in the house for from five to seven minutes. She said that she observed him intently in ample light, but acknowledged that she saw only part of his face and retained a "mental image" only of his eyes. The intruder was black; Mrs. Sykes is white. On the day of the crime, Mrs. Sykes told police she would not be able to help in preparing a "composite" sketch of the robber.

Defendant was arrested about a month after the event. Mr. Sykes never identified him as the robber, but Mrs. Sykes—after failing to recognize his picture in a photo array—picked him out of a lineup at which she both saw him and heard his voice. At defendant's first trial, Mrs. Sykes testified to her lineup

identification. Defendant was convicted, but the conviction was reversed because certain evidence, including the lineup identification, was held to be the result of an arrest without probable cause (*People v Young*, 255 AD2d 905 [1998]).

In 1999, before defendant was retried, the trial court held an "independent source" hearing, and found that Mrs. Sykes was able to identify defendant as the robber based on her observations at the time of the crime. At the retrial, Mrs. Sykes made an in-court identification.

The People also put in evidence at the retrial the binoculars and the gloves that had been missing from the Sykeses' cars. These were obtained by the police a month after the crime from two women, both acquaintances of defendant. One of the women testified that she had received the binoculars from defendant, along with watches similar to those stolen from the Sykeses. The other woman testified that she did not know how the gloves came to be in her house; she had had many house guests, of whom defendant was one.

Defendant sought to present at the retrial the testimony of John Brigham, a professor of psychology who had studied factors affecting the accuracy of eyewitness identifications. In a proffer outside the presence of the jury, Brigham made the general statement that "eyewitness identification memories" are "a . . . difficult kind of memory . . . a kind of memory that people are not good at; that is, recognizing the faces of strangers."

Brigham also listed a number of factors that can make eyewitness identifications more or less accurate. Some, he acknowledged, are obvious—for example, the witness's opportunity to observe—but others are less so. Among the factors Brigham mentioned were that people are generally more accurate in identifying people of their own race than of another race; that, where a crime is committed with a weapon, the victim's tendency to focus on the weapon may interfere with his or her observation of the criminal; that a stressful experience is more likely to be a memorable one up to "a moderate level of stress," but that events generating "higher levels of stress" are remembered less well; and that there is "only a very weak relationship" between a witness's confidence in the accuracy of his or her recollection and its true accuracy—i.e., that people very confident in their recollections are often wrong. After hearing the proffer, the trial court ruled that the evidence would be excluded in the exercise of its discretion.

Defendant was again convicted of robbery and burglary. The Appellate Division affirmed the conviction, two Justices dissenting on the ground that the People failed to establish an independent source for Mrs. Sykes's identification testimony. We now affirm.

## Discussion

■ Defendant first argues that the trial court's "independent source" finding, which the Appellate Division affirmed, was wrong as a matter of law. His argument, essentially, is that, considering Mrs. Sykes's limited view of the robber, and the long lapse of time and the many intervening events—including the photo array and the lineup—between the crime and the independent source hearing, it was impossible to find by the requisite clear and convincing evidence that the lineup would not influence her in-court identification (*see United States v Wade*, 388 US 218, 240 [1967]; *People v Ballott*, 20 NY2d 600, 606 [1967]). The argument has force—indeed, it persuaded two Appellate Division Justices—but Supreme Court and the Appellate Division majority rejected it. In doing so they resolved an issue of fact. There is support in the record for their finding, and we may not disturb it (*see People v Malloy*, 55 NY2d 296, 300 [1982]).

■ The harder question is whether the trial court abused its discretion in excluding Brigham's testimony. In *People v Lee* (96 NY2d 157 [2001]) (decided after the trial court's ruling in this case), we held that the decision to admit or exclude evidence of this sort is a discretionary one. We said that although "jurors may be familiar from their own experience with factors relevant to the reliability of eyewitness observation and identification, it cannot be said that psychological studies regarding the accuracy of an identification are within the ken of the typical juror" (*id.* at 162). Thus, there are cases in which testimony like Brigham's may be admitted, in the exercise of the court's discretion; and indeed, there are cases in which it would be an abuse of discretion to exclude such evidence. This case is undoubtedly in the former category—the trial court here might well have admitted Brigham's testimony—but we conclude that it is not in the latter; the trial court's ruling was within the bounds of its discretion.

In reaching this conclusion, we consider two factors: the extent to which the research findings discussed by Brigham were relevant to Mrs. Sykes's identification of defendant; and

the extent to which that identification was corroborated by other evidence. The first of these factors favors the admission of the testimony—so much so that, if the identification were not strongly corroborated, the exclusion of Brigham's testimony would be hard to justify. But the corroboration was strong enough for the trial court reasonably to conclude that the expert's testimony would be of minor importance.

As we made clear in *Lee*, a court's exercise of discretion in a case like this depends in large part on whether the "specialized knowledge" of the expert can give jurors more perspective than they get from "their day-to-day experience, their common observation and their knowledge" (*id.*, quoting *People v Cronin*, 60 NY2d 430, 433 [1983]). In other words, could the expert tell the jury something significant that jurors would not ordinarily be expected to know already? Here, we think the answer is yes.

Admittedly, some parts of Brigham's testimony concerned things jurors would not need an expert to tell them. It does not require scientific research, for example, to establish that an identification is more reliable when the witness's original opportunity to observe was good. But some of Brigham's other observations are, as he put it, "counter-intuitive"—or, at least not so obvious or well known that ordinary jurors would not benefit from hearing them. And in cases that depend solely or heavily on eyewitness testimony, jurors may also find it useful to know Brigham's general conclusion that human recollection of the faces of strangers is, on the whole, rather poor.

Certainly, Brigham's testimony could have been valuable to a juror in this case in assessing Mrs. Sykes's testimony. Having seen only part of the offender's face, and really remembering only his eyes, under conditions of high stress and with the terrifying distraction, part of the time, of an axe held over her husband's head, she nevertheless identified defendant with complete—and, unquestionably, sincerely felt—confidence. Brigham's testimony might have helped the jury in deciding whether that confidence was misplaced. Of course, that decision was for the jury, not Brigham, to make. His findings might have been undermined on cross-examination or refuted by other evidence, and even if they were not it would have been for the jury to decide what weight, if any, to give them. But if this case turned entirely on an uncorroborated eyewitness identification, it might well have been an abuse of discretion to deny the jury the benefit of Brigham's opinions.

The corroborating evidence, however, significantly diminishes the importance of the proffered expert testimony in this case—as it did in *Lee,* where we affirmed a conviction arising out of a carjacking, despite the exclusion of expert testimony like that proffered here, in part because the defendant had been arrested driving the car in question (96 NY2d at 163). Here, stolen property was found in possession of two of defendant's acquaintances; neither of them could have been the robber, since both were women; and one of them pointed to defendant as the person from whom she got the property. It was reasonable, under the circumstances, for the trial court to conclude that Mrs. Sykes's identification was quite unlikely to be mistaken, and that Brigham's testimony would be an unnecessary distraction for the jury.

Accordingly, the order of the Appellate Division should be affirmed.

G.B. SMITH, J. (dissenting). This is an appeal from the defendant's second trial. At the first trial, the only witness to identify defendant testified that she picked him out of a lineup. No in-court identification was made. Defendant was found guilty of robbery in the first degree and burglary in the first degree. It was error, as a matter of law, to permit an independent source hearing for the prosecution's only identification witness prior to the second trial. It was also an abuse of discretion for the court to preclude the admission of expert testimony by the defendant regarding the factors that affect the reliability of human perception. Accordingly, I dissent.

This case arises as a result of a March 1991 home invasion robbery of William and Lisa Sykes where the perpetrator wore a scarf over his face, a blanket over his clothes, and wielded an axe and a sledgehammer. The assailant's forehead, eyes, and part of the nose were visible. Only Mrs. Sykes gave a description of the assailant to the police, whom she described as a black man in his twenties, 5 feet, 10 inches tall with a medium build. Mrs. Sykes was unable to help form a composite sketch immediately after the incident, nor could she identify anyone in a photo array a month following the home invasion. She did, however, identify appellant as the perpetrator in a lineup in April 1991. Defendant was subsequently convicted of robbery in the first degree (Penal Law § 160.15 [3] [two counts]) and burglary in the first degree (Penal Law § 140.30 [3]) in 1992.

Defendant's initial 1992 conviction was reversed (*People v Young,* 255 AD2d 905 [4th Dept 1998]) as a result of a 1994 Ap-

pellate Division determination that the police lacked probable cause for their April 1991 arrest of appellant. A new trial was ordered. As a result of the 1998 reversal, Mrs. Sykes' 1991 lineup identification of defendant, defendant's statement at the time of arrest and police observations of defendant when arrested were also suppressed.

Since the Appellate Division permitted an independent source hearing prior to the second trial, and over defendant's objection, Supreme Court conducted an independent source hearing in March 1999. The only witness to identify defendant stated that she had told the police that the perpetrator was "[a] man, light black in color, around five-ten, medium build, and later twenties." She testified further that the man's face was covered with a scarf with the exception of his eyebrows, eyes and part of his nose. His clothes were covered with a blanket from the Sykes' car. Mrs. Sykes testified that because she had focused on the intruder's eyes during the robbery, she was certain it was defendant. Furthermore, she claimed that she engraved a mental picture of defendant's eyes in her mind and had nightmares for several nights following the invasion. She testified that there was nothing distinctive about the portions of his face that she observed. The man was carrying an axe and a sledgehammer that belonged to the Sykes. The intruder demanded money and he followed her husband, who was in a wheelchair, into another room to get it. The man also took money which Mrs. Sykes obtained from her purse. At one point, the perpetrator ordered her not to look at him. The intruder was in their presence for five to seven minutes. Subsequently, Mrs. Sykes declined to aid the police in making a sketch of the intruder because she had not seen his whole face. Moreover, she failed to pick him out of several photographs shown to her.

Defendant was convicted again in January 2000 of robbery in the first degree (Penal Law § 160.15 [3] [two counts]) and burglary in the first degree (Penal Law § 140.30 [3]).

Supreme Court erred in its determination that the People established, by clear and convincing evidence, that Mrs. Sykes had an independent basis for her second-trial, in-court identification of defendant. The court asked Mrs. Sykes:

> "THE COURT: Do you have a recollection of the defendant, independent of having seen him at the lineup?
>
> "THE WITNESS: Yes, from that night in our home.

"THE COURT: That is independent of the lineup; is that correct?

"THE WITNESS: That date on March 29. . . . Yes."

This was hardly convincing in light of the prior testimony as to the circumstances of the home invasion. As recognized by the two-Justice dissent at the Appellate Division, the fact that the witness could not assist in composing a composite sketch and could not identify a photograph of the defendant are factors that make any in-court identification impermissible as a matter of law in this case.

The trial court also erred in refusing to permit expert testimony on the issue of identification. Dr. John Brigham was a professor of psychology at Florida State University and a former president of the American Psychology-Law Society. In an offer of proof, Professor Brigham was prepared to testify to three factors that affect a person's ability to make an accurate identification including (1) factors affecting memory such as an ability to observe, cross-racial identification, stress, a weapon, a distinctive face and a disguise; (2) retention of what was observed including elapsed time, information obtained after the event and unconscious transference; and (3) retrieval of a situation including suggestiveness and the absence of correlation between confidence and accuracy.* Dr. Brigham attempted to convey scientific findings that showed the weak correlation between witness confidence and accuracy, the difficulty of remembering a face when the mind cannot encode all the features at once, and the possibility of memory source confusion.

As defendant's expert indicated, "[t]he most difficult part of a memory to maintain is the source." If the witness could not help form a composite sketch or identify defendant's photo in an array days before the illegal lineup, her testimony that de-

---

* For instance, Dr. Brigham stated:

"[This testimony] may strike you as being obvious, but [it is] not obvious to the average juror when jurors are asked about these factors. In our own study and other studies prospective jurors are asked. A lot of them don't know about these things, don't know about weapon focus. They don't know about the effect of stress. They begin when somebody says it's burned on my memory, it must be accurate, when, in fact, research shows that it's unlikely to be. They may or may not know about suggestivity. They don't know about unconscious transference. They don't know about the effect of post event determination. There are a lot of factors too."

fendant was the intruder had no independent basis separate from the illegal lineup. During the court's examination of Dr. Brigham, the trial judge seemed inappropriately concerned by Dr. Brigham's studies on stress and reliability which did not include persons who were personally robbed, but people who witnessed staged robberies (*cf. People v Aphaylath*, 68 NY2d 945 [1986] [holding that an expert need not have knowledge of a defendant's particular characteristics for testimony to be admitted]). The judge gave no reason, however, for his disallowance of Dr. Brigham's testimony but stated he was "going to exercise [his] discretion . . . [and] not . . . allow as evidence [Dr. Brigham's] testimony at the time of trial."

In fact, during questioning at the hearing, Mrs. Sykes repeatedly stated she was not sure defendant was the intruder until she saw and heard him in the lineup. Nothing occurred subsequent to defendant's illegal arrest in the intervening eight years that demonstrated Mrs. Sykes' independent observation of defendant as the perpetrator. Therefore, both the independent source hearing and its finding were errors as a matter of law.

In *People v Mooney* (76 NY2d 827, 828 [1990]), then Judge Kaye dissented from what she termed the "court's cursory treatment of defendant's claim" that expert testimony be admitted. She went on to say that "the emerging trend today is to find expert psychological testimony on eyewitness identification sufficiently reliable to be admitted, and the vast majority of academic commentators have urged its acceptance" (76 NY2d at 829). That statement applies to this case.

In *People v Lee* (96 NY2d 157 [2001]), this Court unanimously stated that a trial court has discretion to allow expert testimony on the reliability of eyewitness identification where it determines the expert would assist the jury in reaching a verdict. There, this Court upheld the denial of expert testimony. In *Lee*, however, the witness had picked defendant's photograph from an array shown to him, had identified defendant at a lineup and identified him again at the trial. In *Lee* the initial identification by photograph took place approximately six months after the incident. Here, by contrast, the witness could not help form a composite sketch on the night of the incident, did not identify defendant in a photo array a month after the incident, did identify the defendant in a lineup two days after the photo array and did identify him in court eight years after the incident.

The majority's ruling misses the opportunity to hold that here, as a matter of law, where eyewitness identification is attenuated and possibly tainted, and corroborating evidence is weak, courts should allow expert testimony concerning eyewitness identification.

Accordingly, I dissent.

Chief Judge KAYE and Judges CIPARICK, ROSENBLATT, GRAFFEO and READ concur with Judge R.S. SMITH; Judge G.B. SMITH dissents and votes to reverse in a separate opinion.

Order affirmed.